# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

TANYA L. SIMPSON,

          Plaintiff(s),              **DECISION & ORDER**

    v.                              11-CV-6500JWF

MICHAEL J. ASTRUE,

          Defendant(s).

---

## Preliminary Statement

Plaintiff Tanya L. Simpson brings this action pursuant to Titles II and XVI of the Social Security Act, seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits. See Complaint (Docket #1). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. See Dockets ##10, 11.

## Background and Procedural History

On September 14, 2009, plaintiff applied for Title II disability insurance benefits. Administrative Transcript ("Tr.") 17–18. Plaintiff subsequently filed an application for Title XVI benefits, which was consolidated with the Title II claim. Id. On October 30, 2009, plaintiff received a Notice of Disapproved Claim. Tr. 84–95. Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). Tr. 72–73. On May 4, 2011, a

hearing was held via video-teleconference with ALJ Jennifer Whang. Tr. 15—47. Plaintiff, who was represented by attorney Lynda Fisher, testified at the hearing, as did Vocational Expert Melissa Glannon. Id. On May 23, 2011, the ALJ issued a decision, therein determining that plaintiff "is not disabled under sections 216(i) and 223(d) of the Social Security Act" and "is not disabled under section 1614(a)(3)(A) of the Social Security Act." Tr. 52—61. In making these determinations, the ALJ found that, despite plaintiff's "severe impairments," she had the ability to perform "light work."[1] Tr. 56. On July 11, 2011, plaintiff timely filed a request for review of the ALJ's decision by the Appeals Council. Tr. 3. On August 12, 2011, the Appeals Council refused to review the ALJ's decision, making the ALJ's decision the final decision of the defendant Commissioner. Tr. 1—2. This federal lawsuit followed.

## Plaintiff's Medical History

On October 12, 2007, plaintiff sought treatment for depression at Unity Family Medicine at St. Bernard's, where she was treated by

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Dr. Sheryl Holley. Tr. 254—55. Plaintiff reported having anxiety and "manic episodes or thoughts of death or suicide." Tr. 254. Dr. Holley noted that plaintiff "has the symptoms of a major depressive episode." Id. Dr. Holley diagnosed plaintiff with "poorly controlled" depression not otherwise specified ("NOS") and referred her to the Greece Mental Health center for counseling. Tr. 255.

On October 30, 2007, plaintiff had a "Social and Pysch Assessment" performed at Unity Health System by Jason Goldswer, LMSW, a Primary Therapist II. Tr. 274—83. Mr. Goldswer noted that plaintiff presented problems of depression, mood disorder, and anxiety, and she reported symptoms of "anxiety, depression, obsessive compulsive disorder and agoraphobia," as well as having a "number of prior major depressive episodes." Tr. 274, 277, 282. Mr. Goldswer noted that plaintiff's mood was "depressed" and ultimately diagnosed her with "Mood Disorder, NOS." Tr. 280, 283. Mr. Goldswer recorded a Global Assessment of Functioning ("GAF") score of 50 for plaintiff. Tr. 283.

On November 30, 2007, plaintiff underwent a psychiatric evaluation with Dr. Stacey DiMartino. Tr. 263—73. Dr. DiMartino diagnosed plaintiff with depression and mood disorder NOS and rated plaintiff's GAF score at 55. Tr. 272.

On February 25, 2009, plaintiff was discharged from Unity Health. Tr. 258—62. As of that date, according to her discharge summaries, plaintiff was diagnosed with Major Depressive Disorder and was assessed with "impulsivity" and "severe anxiety." Tr. 258,

3

261. The discharge summaries noted that plaintiff "did not follow through with therapy and has not responded to letters of concern." Tr. 262. Although plaintiff was diagnosed with "major depression," she was discharged due to lost contact. Id.

Plaintiff was evaluated by two psychologists as a result of her filing applications for disability benefits and public assistance. On July 1, 2010, Kavintha Finnity, Ph.D. conducted a "Psychological and Intellectual Assessment for Determination of Employability" on behalf of the Monroe County Department of Social Services. Tr. 322—27. Dr. Finnity documented that plaintiff frequently exhibits behavior that "interferes with activities of daily living." Tr. 323. Dr. Finnity noted that plaintiff's mood was abnormal, as she was "dysthymic and irritable." Id. Dr. Finnity diagnosed plaintiff with "major depressive disorder, moderate; anxiety disorder, NOS," assessed a GAF score of 55, and concluded that plaintiff "is unable to participate in any activities except treatment or rehabilitation." Tr. 325—26. On October 13, 2009, Christine Ransom, Ph.D. conducted a psychiatric evaluation of plaintiff and diagnosed her with "bipolar disorder, currently moderate, with psychotic features." Tr. 296—99.

On September 21, 2010, plaintiff was seen in the Emergency Center at Unity Hospital. Tr. 426. Plaintiff went to the Emergency Center to seek treatment for back pain she was suffering due to a motor vehicle accident she was involved in two days prior, September 19, 2010. Tr. 427. On October 4, 2010, plaintiff saw her primary

4

care physician, Dr. Shazia Janmuhammad, for "back of neck pain" she was experiencing due to the September 19 car accident. Tr. 414—15. Plaintiff had indicated that she had been to the chiropractor three times for treatment, but the chiropractic treatment "does not seem to work" on her pain. Id. On November 8, 2010, Dr. Janmuhammad treated plaintiff again for back pain. Tr. 409—10. Dr. Janmuhammad documented that plaintiff had tension and pain in her mid-back and had been suffering pain "since the car accident" on September 19. Id. On December 28, 2010, plaintiff went to see Dr. Janmuhammad again to have her arthritis, back pain, and allergies treated. Tr. 407—08. Plaintiff had been experiencing "hand pain, numbness and feeling of swelling" since her car accident, which "aggravated" her symptoms. Id. On February 10, 2011, the MRI of plaintiff's spine revealed some abnormalities, including "C5-6 right paracentral disc protrusion with mild flattening of the ventral cervical sac and mild canal narrowing" and "C6-7 mild left paracentral disc bulge." Tr. 419.

On December 16, 2010, plaintiff re-engaged with Unity Mental Health and met with Sarah Lechner, LMSW. Tr. 379. Plaintiff complained of "depression, anxiety, mood swings . . . feeling sad all the time . . . [and] decreased interest and pleasure." Tr. 380. Ms. Lechner noted that plaintiff's mood was "anxious, depressed, sad," her affect was "anxious, constricted, depressed," and she was suffering from "severe anxiety." Tr. 385.

On January 13, 2011, Ms. Lechner saw plaintiff again and noted

5

that her mood and affect were "anxious." Tr. 376. Ms. Lechner diagnosed plaintiff with depressive disorder, noted that her problems included anxiety and depressed mood, and gave her a GAF score of 55. Tr. 391. On January 28, 2011, Ms. Lechner again saw plaintiff and noted that her mood and affect were anxious and depressed and that plaintiff presented as "evasive and guarded." Tr. 371-72. On February 11, 2011, plaintiff had another therapy session with Ms. Lechner. Tr. 368-70. Plaintiff presented "with pressured speech and flight of ideas," and her mood was anxious and depressed. Tr. 368. On February 21, 2011, Ms. Lechner noted in a treatment plan progress note that plaintiff had attended "3 out of 5" scheduled therapy appointments, "continues to struggle with depressive and anxious symptoms," and "does not meet discharge criteria at this time due to continued benefit from therapy and need for psychiatric evaluation." Tr. 390.

During a therapy session on March 14, 2011, Ms. Lechner noted that plaintiff's mood and affect were anxious and depressed, and her thought process included "helplessness [and] obsessions." Tr. 362. On March 15, 2011, Ms. Lechner completed a Mental Residual Functional Capacity Assessment on behalf of plaintiff. Tr. 353-54. Ms. Lechner indicated that plaintiff had "severe" impairments with respect to the following: (1) the "ability to maintain attention and concentration for at least two straight hours with at least four such sessions in a work day," (2) "ability to make simple work-related decisions," and (3) "ability to complete a normal workday

6

and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable number and length of rests." Tr. 353. Ms. Lechner further noted on the Assessment that plaintiff "has [a] history of major depressive disorder and presents severe depressive and anxious symptoms" and found that "further evaluation is needed." Tr. 354. During a therapy session on April 12, 2011, Ms. Lechner noted that plaintiff's mood and affect were anxious and depressed. Tr. 356. Ms. Lechner further noted that plaintiff's thought process included "helplessness, obsessions, [and] preoccupations." Tr. 355.

On February 23, 2011, plaintiff's primary care physician, Dr. Janmuhammad, completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)." Tr. 346—49. Dr. Janmuhammad found that plaintiff's ability to do the following was affected by her impairments (back, neck, and hand pain): (i) she could only occasionally lift and/or carry less than ten pounds ("occasionally" meaning "occurring from very little up to one-third of an 8-hour workday"); (ii) stand and/or walk "less than 2 hours in an 8-hour workday"; (iii) "must periodically alternate sitting and standing to relieve pain or discomfort"; and (iv) pushing and/or pulling is limited in both upper and lower extremities. Tr. 346—47. Dr. Janmuhammad also found that plaintiff could "never" crawl or stoop and could only "occasionally" climb, balance, kneel, or crouch. Tr. 347. Dr. Janmuhammad also found that plaintiff had "limited" manipulative functions in handling, fingering, and feeling. Tr. 348.

7

## Hearing Testimony

Testimony of Plaintiff: At the May 3, 2011 hearing, plaintiff testified that she was thirty-four years old, lived alone in an apartment, had not worked since 2008, received unemployment benefits for approximately two years after her last job in 2008, and was currently receiving Department of Social Services benefits, including food stamps and a medical card. Tr. 21—23, 26—28. Plaintiff testified that prior to 2008, she had "worked at a couple of different places," including (i) the University of Rochester, where she answered phones and did data entry and customer service, and (ii) Axiant, where she did data entry and answered phones. Tr. 23—24. Plaintiff left her job at the University of Rochester because she "had to sit all day" and she "just couldn't do it anymore." Tr. 23. Plaintiff stopped working at Axiant because the company "shut down." Tr. 24. Plaintiff admitted that she "would have been fired anyways" from Axiant because "no matter how hard I tried, I could not get there on time. I have a late problem with, like, all of my jobs." Id.

Plaintiff testified that her typical day does not include "any activities . . . I don't really do anything." Tr. 28. Plaintiff testified that she does laundry monthly but does not cook "at all." Id. Plaintiff testified that she "maybe used to be a little more active because I used to have to go to work." Id. Plaintiff is able to shower and dress herself on her own "when needed," but she has problems doing other "personal care" - such as her "hair and

8

stuff" - because she has "problems with, like, my hands, my muscles." Tr. 29. Plaintiff testified that her physical problems include "back problems, my hands and - that's going up my arms and down my legs." Tr. 33. Plaintiff's back pain is in her "mid-back, in the arch," and it "burn[s]" on both sides of her body and "increases as I sit." Tr. 37. Plaintiff's back pain increases after approximately fifteen to twenty minutes of sitting, and "when I drive anywhere between 15 and 30 minutes." Tr. 38. Plaintiff also has trouble with her back pain when standing. Id. Plaintiff testified that her back pain starts to bother her after the same amount of time as sitting (i.e., fifteen to twenty minutes), and "[i]t's easier to be moving." Id. Plaintiff has trouble bending as well. Tr. 39. Plaintiff testified that she has trouble bending down to pick something up or to file, which has caused her problems with certain jobs in the past because "I do not bend. . . . I couldn't do it." Id.

Plaintiff also testified that she sees a mental health therapist "on a regular basis at Unity Mental Health." Tr. 32. She testified that her therapist gave her medication - "a generic Prozac, I think" - but she does not take it because it is in capsule form and "I can't take capsules." Id. Plaintiff stated that she sees the mental health therapist approximately "every two weeks" because she has been diagnosed with "severe depression." Tr. 33-34.

Testimony of the Vocational Expert: During the May 3, 2011 hearing, Vocational Expert ("VE") Melissa Glannon also testified.

9

Tr. 39—46. The VE classified plaintiff's previous work as (i) "sedentary and semiskilled with an SVP [specific vocational preparation] of four," (ii) "sedentary and semiskilled with an SVP of three," (iii) one that required a "medium level of exertion," and (iv) "light and unskilled with an SVP of two." Tr. 42—43. The ALJ asked the VE to assume a hypothetical individual of the same age, education, and vocational experience as plaintiff, who was limited to light work with the following limitations:

[O]nly occasional use of ramps and climbing stairs but never climbing ladders, ropes or scaffolds; can do occasional stopping, kneeling, crouching, crawling; should avoid hazards including moving machinery and unprotected heights; is limited to simple, routine and repetitive tasks; requires a low-stress job defined as having only occasional decision making and occasional changes in the work setting and should have only occasional indirect interaction with the public.

Tr. 43. When asked by the ALJ if such an individual could perform plaintiff's previous work, the VE testified that such a person would not be able to perform any of plaintiff's past relevant work. Id. The VE testified, however, that such an individual could perform other work in the national and New York state economies, such as unskilled cleaning jobs, unskilled hand packing jobs, and unskilled production inspector jobs. Tr. 43—44.

The ALJ then changed the hypothetical, adding "a sit/stand option, allowing her to alternate between a sitting and standing position every 30 minutes." Tr. 44. The VE testified that "[t]he cleaning jobs would not remain. The hand packing jobs would decrease to approximately 80,000 nationally, 3,200 in the state of

10

New York.    The  production  inspector  jobs  would  decrease  to
approximately 62,000 nationally and 2,700 in the state of New York."
Id.  The ALJ again changed the hypothetical "down to sedentary work[2]
with all the limitations in hypotheticals one and two" and asked the
VE whether "there would be any sedentary jobs available with all
those limitations."  Id.  The VE testified that sedentary unskilled
assembler,  bench  work  labor,  and  unskilled  mail  addressing  jobs
exist.   Tr. 45.   The ALJ concluded by asking the VE:

> [I]f I add to any of those [three] hypotheticals above any
> of these additional limitations, would any of those jobs
> remain[:] claimant is expected to be off task more than
> 30 percent of the day due to concentration issues or would
> require unscheduled breaks or be absent more than three
> times a month, would any jobs remain?

Tr. 45—46.   The VE testified that no jobs would remain.   Tr. 46.


## Determining Disability Under the Social Security Act

The "Five Step" Evaluation Process:   The Social Security Act
provides that a claimant will be deemed to be disabled "if he is
unable to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which . . .
has lasted or can be expected to last for a continuous period of not
less  than  twelve  months."    42  U.S.C.  §  1382c(a)(3)(A).    The

---

[2] "Sedentary work involves lifting no more than 10 pounds at a
time and occasionally lifting or carrying articles like docket
files, ledgers, and small tools. Although a sedentary job is defined
as one which involves sitting, a certain amount of walking and
standing is often necessary in carrying out job duties. Jobs are
sedentary if walking and standing are required occasionally and
other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

11

impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity [("RFC")] to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000). See also 20 C.F.R. §§ 404.1520, 416.920. Plaintiff bears the burden of proving her case at steps one through four. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that Commissioner "need not provide additional evidence of the claimant's residual functional capacity" at step five). See also 20 C.F.R. 404.1560(c)(2).

The ALJ's Decision: In applying the five-step sequential evaluation, the ALJ made the following determinations. At the first step, the ALJ found that plaintiff was not currently engaged in substantial gainful activity and had not been so engaged since September 30, 2008. Tr. 54. At the second step, the ALJ found that plaintiff has a combination of the following "severe impairments" which significantly limit her ability to do basic work activities: scoliosis, cervical spine disc bulging, cervical disc degeneration, major depressive disorder, bipolar disorder, obsessive compulsive disorder, generalized anxiety, attention deficit disorder, and marijuana abuse.[3]   Tr.54—55.

At the third step, the ALJ analyzed the medical evidence and found that plaintiff did not have a listed impairment which would have rendered her disabled without consideration of vocational

---

[3]   The ALJ found that plaintiff's substance abuse disorder was not a contributing factor to the determination of disability.

13

factors such as age, education, and work experience.  Tr. 55—56.

Accordingly, the ALJ moved to the fourth step, which required asking whether plaintiff has the residual functional capacity ("RFC") to perform her past work, notwithstanding her combination of severe impairments.  Tr. 56.  The ALJ concluded that plaintiff retained the ability to perform "light work," with a number of additional limitations.  Id.  Based on plaintiff's RFC, the ALJ accordingly determined that plaintiff could not perform her past work as a data entry clerk, telemarketer, and food server.  Tr. 60.

Because plaintiff was unable to perform her past work, the ALJ proceeded to the fifth step, which is comprised of two parts.  Id.  First, the ALJ assessed plaintiff's job qualifications by considering her physical ability, age (thirty-two years old), education (high school graduate), and previous work experience.  Id.  The ALJ next determined whether jobs exist in the national economy that a person having her qualifications and RFC could perform.  Tr. 60—61.  See also 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f).  The ALJ found that plaintiff's ability to perform all or substantially all of the requirements of light work had been impeded by "additional limitations" but, based upon the VE's testimony, the ALJ found that plaintiff's limitations did not totally erode the unskilled light occupational base.  Tr. 60—61.  The ALJ adopted the VE's opinion testimony that plaintiff was able to perform several jobs in the national economy, namely, "production inspector" and "hand packer".  Id.

14

## **Standard of Review**

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine *de novo* whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir. 2007) (internal citations and quotation marks omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447—48 (internal citations and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal citation and quotation marks omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's determination. "Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants

15

affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009). See also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

16

## **Discussion**

Plaintiff raises a number of challenges to the ALJ's decision, including (1) the failure of the ALJ to consider the opinion of plaintiff's mental health therapist in formulating the RFC, (2) failing to accord proper weight to the opinion of her treating physician, and (3) failure to include all of plaintiff's limitations in the hypothetical posed to the VE.  See Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings (Docket #11).

1. Failure to Consider the Opinion of Plaintiff's Therapist in Formulating Plaintiff's RFC:  With regard to mental abilities, the regulations provide as follows:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(c).  The RFC must take into account the "[t]otal limiting effects" of all of a claimant's impairments, even those that are not severe, and the ALJ must consider "all of the medical and nonmedical evidence, including" the information regarding the claimant's mental abilities as outlined in § 404.1529(c).  20 C.F.R. § 404.1529(e).  An RFC finding must also represent a function-by-function assessment of a claimant's abilities.  20 C.F.R. §§ 404.1545, 416.945.

17

Here, four "acceptable medical sources" diagnosed Simpson with some form of depression or psychiatric disorder. See Tr. 254–55 (Dr. Holley, Unity Health Systems, diagnosing depression NOS); Tr. 272 (Dr. DiMartino, diagnosing major depressive disorder, moderate, recurrent); Tr. 323 (Dr. Finnity, Monroe County Department of Social Services, diagnosing major depressive disorder NOS and anxiety disorder); Tr. 298 (Dr. Ransom, consultative psychologist, diagnosing bipolar disorder, moderate, with psychotic features). Further, Ms. Lechner diagnosed plaintiff with depressive disorder NOS and provided her with supportive psychotherapy beginning in December 2010. Tr. 362, 391. Over the course of her treatment notes, Ms. Lechner described plaintiff as evasive, restless, anxious, distractible, and having pressured speech, thought-blocking, and flight of ideas. Tr. 368–69, 371–72.

Plaintiff argues that the ALJ improperly ignored evidence from Ms. Lechner, namely, that plaintiff has "severe" impairments, as discussed in the Mental Residual Functional Capacity Assessment ("MRFC") form, dated March 15, 2011. Tr. 353–54. According to the MRFC, as the result of her mental disorder, plaintiff has severe impairments in her abilities to (1) maintain concentration for at least two straight hours, (2) complete a normal workday or workweek without interruption from psychologically-based symptoms, and (3) perform at a consistent pace without an unreasonable number and length of rest-periods. Id. The MRFC form defined "severe" as meaning the activity "is totally precluded on a sustained basis and

18

would result in failing even after short duration; e.g., 5-15 minutes." Id. The limitations identified by Ms. Lechner are significant for a person attempting to participate in the competitive workforce. When the ALJ posed a hypothetical to the VE including these limitations (i.e., the individual was expected to be off-task more than 30% of the day due to concentration issues or would require unscheduled breaks or would be absent more than three times per month), the VE testified that there remained no jobs that Simpson could perform in the national economy. Tr. 45–46.

The ALJ justified her disregard of Ms. Lechner's opinion on the basis that she is not an "acceptable medical source" as defined in 20 C.F.R. § 404.1513(a). Tr. 60. "Acceptable medical sources" include, inter alia, licensed physicians (medical or osteopathic doctors), and licensed or certified psychologists. 20 C.F.R. § 404.1513(a)(1), (2). Licensed social workers are not included in the list of acceptable medical sources, but 20 C.F.R. § 404.1513(d) provides that the SSA "may also use evidence from other sources to show the severity of [the claimant's] impairment(s) and how it affects [her] ability to work." In addition, SSR 06-03p[4] clarifies that "[t]he term 'medical sources' refers to both 'acceptable medical sources' and other health care providers who are not

---

[4] "SSRs" are Policy Interpretation Rulings. The stated purpose of SSR 06-03p is, in part, to "clarif[y] how [the SSA] consider[s] opinions and other evidence from medical sources who are not 'acceptable medical sources[.]'" SSR 06-03p, 2006 WL 2329939, at *4 (Aug. 9, 2006).

19

'acceptable medical sources.'" SSR 06-03p, 2006 WL 2329939, at *1 (Aug. 9, 2006).

SSR 06-03p states that information from "'other sources' cannot establish the existence of a medically determinable impairment," but "information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. at *2. SSR 06-03p recognizes that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,'" such as licensed clinical social workers, "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." Id. at *3. Opinions from these medical sources, although "not technically deemed 'acceptable medical sources' under [the] rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Id. (emphasis added).

SSR 06-03p explains that opinions from "non-medical sources," such as Ms. Lechner, are to be evaluated by using the applicable factors listed in the section "Factors for Weighing Opinion Evidence." Id. at *4-5 (e.g., how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source

20

presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment(s); and any other factors that tend to support or refute the opinion). SSR 06-03p also provides that an opinion from a "non-medical source" who, like Ms. Lechner, has seen the claimant in a "professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source," such as when "the 'non-medical source' has seen the individual more often and has greater knowledge of the individual's functioning over time and if the 'non-medical source's' opinion has better supporting evidence and is more consistent with the evidence as a whole." Id. at *6.

As plaintiff notes, the ALJ merely recited Ms. Lechner's opinion and rejected it in one sentence: "Because Ms. Lechner is not an acceptable medical source, the undersigned assigns no weight to her opinion." Tr. 60. The ALJ did not apply any of the factors detailed in the regulations and in SSR 06-03p in determining what weight to give Ms. Lechner's opinion. Although the ALJ states that Ms. Lechner "is not an acceptable medical source" as her reason for assigning no weight to Ms. Lechner's opinion, merely stating that an opinion exists but declining to give it any weight because it is not from an acceptable medical source is not the same as considering the opinion, and it is contrary to the letter and spirit of the Social Security Act. See Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990)

21

("The [Social Security] Act must be liberally applied, for it is a remedial statute intended to include not exclude.").

The factors outlined in SSR 06-03p weigh in favor of giving some weight to Ms. Lechner's opinion. Ms. Lechner is a specialist and has a relationship with plaintiff, having treated her on seven occasions beginning in December 2010. Ms. Lechner's opinions are reflected in her detailed treatment notes, which consistently note plaintiff's restlessness, anxiousness, and depressed affect. Ms. Lechner's opinion on plaintiff's ability to concentrate is consistent with the estimation by Dr. Finnity, consultative psychologist with the County Department of Social Services, that plaintiff would be unable to function 50% of the time in the areas of maintaining attention and concentration for rote tasks and in regularly attending to a routine and maintaining a schedule. Tr. 325. Dr. Ransom, whose opinion defendant now points to as the reason for rejecting Ms. Lechner's opinion, also found plaintiff to have "moderate" impairments in attention, concentration, and memory due to her "emotional disturbance." Tr. 298. Though the ALJ was not required to give controlling weight to Ms. Lechner's opinion, the ALJ was required to give her opinion consideration. See, e.g., Warren v. Astrue, No. 09-CV-6217, 2010 WL 2998679, at *4 (W.D.N.Y. July 27, 2010) (finding that the opinions of the plaintiff's social worker were "consistent with those of Plaintiff's treating psychiatrist, with whom he worked closely" and "[t]he ALJ's dismissal of [the social worker's] opinions because he was 'not a

22

psychologist or psychiatrist,' does not accurately reflect the law. . . . The opinions of non-medical sources who nevertheless have a relationship with a claimant in their professional capacity are to be considered by an ALJ") (internal citations omitted); White v. Comm'r of Soc. Sec., 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004) ("[T]he ALJ erred by not giving appropriate weight to the opinion of plaintiff's social worker. Although reports of a social worker are not an 'acceptable medical source' under the regulations, see 20 C.F.R. § 416.913(a), the ALJ should have considered [the] records as 'other source' evidence.") (citing 20 C.F.R. § 416.913(d)).

In sum, the Court finds that although the ALJ was not required to give controlling weight to Ms. Lechner's opinion, the ALJ should have given her opinion some consideration but failed to do so. Thus, the ALJ erred in failing to properly consider Ms. Lechner's opinion when she formulated plaintiff's RFC.

2. The ALJ's Failure to Give Proper Weight to the Opinion of Plaintiff's Treating Physician: Dr. Janmuhammad, plaintiff's treating physician, completed a Medical Source Statement indicating that plaintiff's RFC was less than sedentary on the basis of her back pain and hand pain. Tr. 346—49. Dr. Harbinder Toor consultatively examined plaintiff on behalf of the Commissioner and found mild limitations in pushing, pulling, lifting, reaching, grasping, holding, writing, standing, walking, and sitting. Tr. 285—88. The ALJ gave "great weight" to Dr. Toor's assessment regarding plaintiff's limitations in standing, walking, or sitting

23

for long periods because it was based on what the ALJ described as "medically objective examination." Tr. 59.  The ALJ gave "little weight" to Dr. Toor's opinion regarding plaintiff's limitations in pushing, pulling, lifting, reaching, grasping, holding, and writing "because these limitations are minimal when compared to the entire record." Id.  Notably, the ALJ did not say that Dr. Toor's findings were inconsistent with the record or unsupported by the medical evidence.  Dr. Toor's findings do in fact support Dr. Janmuhammad's conclusion that plaintiff has limitations in her physical abilities. See Spears v. Heckler, 625 F. Supp. 208, 215 (S.D.N.Y. 1985) (noting that where "the opinion of a consultative physician is not contradicted by other medical evidence in the record, and in fact supports rather than undermines plaintiff's claim of disabling impairment," the consultant's diagnosis may not be "simply ignore[d]," because "[i]n reaching a conclusion as to disability, ... all relevant medical facts, diagnoses and medical opinions in the record" must be considered) (citing Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980)).

The ALJ also erroneously quoted Dr. Toor's report when she stated in her decision that "[a]lthough the claimant had difficulty grasping and holding, her hand and finger dexterity were intact." Tr. 57.  In fact, Dr. Toor found that plaintiff's "[h]and and finger dexterity is not intact."  Tr. 286 (emphasis added).  The ALJ's misreading of relevant evidence to plaintiff's disadvantage is significant.  See Genier v. Astrue, 606 F.3d 46, 50 (2d Cir. 2010)

24

("Because the ALJ's adverse credibility finding, which was crucial to his rejection of [plaintiff's] claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence,' 20 C.F.R. § 404.1545(a)(3), and cannot stand."). Accordingly, the Court finds that the ALJ erred in her consideration of Dr. Toor's and Dr. Janmuhammad's reports, which had a prejudicial effect on her disability determination. Upon remand, the ALJ should give serious consideration to these opinions pursuant to the Commissioner's regulations.

3. The ALJ's Failure to Include All of Plaintiff's Limitations in the Hypothetical to the Vocational Expert: The Commissioner may rely on the testimony of a vocational expert to sustain his burden at step five of showing the existence of substantial gainful employment suited to a claimant's physical and vocational abilities as long as "there is substantial record evidence to support the assumption upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983). "[T]he use of hypothetical questions to develop the VE's testimony is permitted, provided that the question incorporates the full extent of a plaintiff's physical and mental limitations." McAninch v. Astrue, No. 09-CV-0969(MAT), 2011 WL 4744411, at *21 (W.D.N.Y. Oct. 6, 2011) (citing Dumas, 712 F.2d at 1553-54). Failing to do so can be reversible error. See De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 936 (2d Cir. 1984) ("In positing hypothetical

25

questions to the vocational consultant, . . . the ALJ did not even present the full extent of [plaintiff's] physical disabilities. . . . As a result, the record provides no basis for drawing conclusions about whether [plaintiff's] physical impairments or low intelligence render him disabled.").

Here, plaintiff's mental impairments are well-documented and long-standing. The ALJ, however, elected to rely on the VE's answer to her initial hypothetical which did not include plaintiff's mental impairments or problems with her hands. None of the ALJ's hypotheticals included the significant impairments documented by Dr. Ransom, Dr. Janmuhammad, or Dr. Toor. Dr. Ransom, the consultative psychologist, diagnosed plaintiff with bipolar disorder, moderate severity, with psychotic features. Tr. 296—99. It seems that such a mental health condition could significantly affect plaintiff's ability to appropriately interact with co-workers and the public and to cope with job-related stressors. This mental impairment, however, was never included in a hypothetical or considered by the VE. Furthermore, Dr. Janmuhammad and Dr. Toor both documented that plaintiff suffers from both back and hand pain, including limitations in pushing, pulling, lifting, reaching, grasping, holding, and writing. Tr. 285—88, 407, 414. These limitations, however, were never included in any of the ALJ's hypotheticals and, as a result, were not addressed by the VE. In sum, the ALJ failed to include some significant impairments and limitations in her hypotheticals posed to the VE.

This error cannot be viewed as harmless. Error involving failure to consider relevant evidence "ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence, at least where the unconsidered evidence is significantly more favorable to the claimant than the evidence considered." Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010). Indeed, when given a hypothetical that included plaintiff's limitations in concentration, persistence, pace, and attendance, the VE concluded that no jobs would be available to plaintiff. The ALJ, however, elected to not consider this response and instead chose to rely on the VE's answer to her first hypothetical. The Court finds that the ALJ erred in doing so. "Although we do not require that, in rejecting a claim of disability, an ALJ must reconcile explicitly every conflicting shred of medical testimony, we cannot accept an unreasoned rejection of all the medical evidence in a claimant's favor[.]" Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983) (internal citations omitted).

## Conclusion

The Commissioner's determination that Simpson is not disabled under the relevant sections of the Social Security Act because there are a significant number of jobs in the national economy which plaintiff would be able to perform is not supported by substantial evidence. The ALJ erred by failing to (i) properly consider the opinion of Ms. Lechner, (ii) give proper weight to the opinion of

27

plaintiff's treating physician, and (iii) include significant mental impairments and physical limitations in her hypothetical to the VE. The Commissioner's motion for judgment on the pleadings (Docket #10) is **denied,** and the plaintiff's motion for judgment on the pleadings (Docket #11) is **granted only insofar as remanding this matter back to the Commissioner for further proceedings consistent with the findings made in this Decision and Order.**

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: August **19** , 2013
Rochester, New York

28